FREDERICK A. SOBERNHEIMER

*v.*

MARVIN D. WHEELER and JOSEPH S. ALLEN.

1. A court of equity takes jurisdiction of fraudulent transfers of personalty under the same circumstances and upon the same ground that it does of fraudulent transfers of real estate.

2. A receiver of partnership assets, appointed by a competent court of another State, may maintain an action in this State to set aside a sale of partnership assets situate in this State, made by one partner in fraud of the other partner, when there are no creditors of the partnership, and the only person to be benefited is the partner who is defrauded.

3. The power of one partner to dispose of partnership property is that of an agent, and, in the absence of express authority, is limited by the usual and ordinary necessities of the business.

4. On a motion for a receiver, if a defendant sets up and relies upon, in his affidavits, any new matter not directly responsive to the matters set up in complainant's affidavits, the complainant may read affidavits in reply to such new matter.

5. In determining whether or not a receiver shall be appointed, the court considers the consequences of the proposed action. If complainant shows a probability that he will succeed in establishing his case at the hearing, and the appointment of the receiver will do little injury to the defendant, while, if the appointment is not made, the subject of the litigation will be removed beyond the reach of the court, the receiver should be appointed.

On order to show cause why an injunction should not issue and a receiver be appointed.

*Mr. Howard Carrow* and *Mr. J. J. Crandall*, for the complainant.

*Mr. S. H. Grey*, for the defendants.

PITNEY, V. C.

The bill is filed by a receiver of the assets of a partnership to establish his title to certain chattels which he claims are part

of those assets.   He was appointed receiver on the 3d day of April, 1889, by the court of common pleas of the city of Philadelphia, in a suit commenced by one of the partners against the other for a dissolution of the partnership and a settlement of its accounts.   The firm was composed of John P. Eyre and Joseph S. Allen, one of the defendants herein, and was formed in the year 1885, under the firm name of J. P. Eyre & Co., for the purpose of carrying on the business of building wharves and bridges and that of general contractors, and was to continue for five years.   The partners resided, and the business was carried on, in the city of Philadelphia.   The suit in the Philadelphia common pleas was commenced by Eyre against Allen on the 24th day of March, 1888, and the bill in that suit alleges that the partnership was dissolved, by mutual consent, on the 22d day of February, 1888, and that all the assets were, at that date, and continued to be, in the hands of and under the control of Allen.   The defendant Allen, in his answer in that suit, denies that the partnership was dissolved at that time, but admits that the assets were left in his hands, and alleges that Eyre abandoned the business on the 22d of February, 1888, and compelled the defendant to continue the same alone, and to carry out and fulfill divers large contracts, which the partnership had undertaken, and which were incomplete at the date last mentioned.   He alleges a dissolution on July 1st, 1888.

The bill in this cause sets out that, at the time of the alleged dissolution, the firm was possessed of a large amount of logs, timber and lumber, lying at Cooper's Point, in Camden county, in this State, of the value of $25,000, and that the complainant is informed that Marvin D. Wheeler, the defendant herein, claims to own the same by pretended purchase from Joseph S. Allen, one of the partners, and the other defendant herein, for the price of $6,780, which, the complainant alleges, is entirely inadequate, and that such sale was and is fraudulent and void as against the complainant, and prays that the sale from Allen to Wheeler may be declared void and complainant's title to the lumber established by decree of this court, and for the appoint-

ment of a receiver and an injunction against the defendants disposing of the property.

On the presentation of the bill (with four affidavits annexed), on the 1st of May, at Camden, an order to show cause why a receiver should not be appointed and an injunction be issued, with an interim restraining order, was made, returnable on the 20th of May. On the return day the defendants asked for further time to prepare their answers and affidavits, and, on that, or a subsequent day, leave was given to the complainant to serve upon the defendants additional affidavits. This was done as one of the terms upon which further time was granted to the defendants, and for the further reason that, at the time the original bill was prepared and presented to the court, a practice prevailed, in that equity district, for both parties to examine witnesses orally on the return of such an order, and it was shortly afterwards announced that that practice would not be further pursued, but that the proofs must be presented in the shape of written depositions. Additional affidavits on the part of complainant were served on defendants on June 22d. Further postponements were allowed to the defendants, from time to time, until the 15th of July, when the matter was finally heard. The answers and depositions in behalf of the defendants were served on complainant's solicitor just four days before the hearing, and complainant's solicitor served on defendants' solicitor several rebutting affidavits two days before the hearing.

Objection was made to the reading of such rebutting affidavits on the ground, among others, that they were not served four days before the hearing; but no request was made to postpone the hearing, which would have been the proper motion to make. However, I incautiously, and, as I now think, improperly, granted defendants leave to put in, after the hearing, further sur-rebutting affidavits, in reply to complainant's rebutting affidavits. This leave they have taken advantage of by handing up a further batch (being the fifth) of affidavits.

The defendants, Allen and Wheeler, have answered separately, though appearing by the same solicitor, and they severally set up a sale by Allen to Wheeler of all the timber and lumber owned

Sobernheimer *v.* Wheeler.

by the partnership in the month of March, 1888, consisting of a large and miscellaneous assortment of logs lying in the river at Cooper's Point, near Camden, and a raft of logs lying at Bordentown, for the sum of $6,780, which they say was a full and fair price for the same, and the best that could be obtained at that time.

The order of the Philadelphia court appointing complainant receiver is as follows:

"And now, to wit, this third day of April, 1889, after hearing, it is ordered and decreed that Frederick A. Sobernheimer, Esq., be and he is hereby appointed receiver of all and singular the books, accounts, records, documents and papers of the late firm of J. P. Eyre & Co., and the equipments, materials, tools, supplies, timber, money, choses in action and property of every description belonging to or appertaining to the said firm of J. P. Eyre & Co., and to collect, take and receive the same and all the assets of the said firm until further order of this court in the premises, with full power and authority to prosecute or defend without the further order of this court any and all actions either in law or equity which he may deem necessary and proper to commence or prosecute, and to defray the reasonable expenses thereof, and to pay the fees of counsel with whom he may consult in the discharge of his duties as receiver.

" It is hereby further ordered that John P. Eyre and Joseph S. Allen and all persons under them, or who may have possession, custody or control of any property or assets of the said firm, shall deliver up and render to the said receiver, all and singular the premises whereof he is appointed receiver as aforesaid."

This order, I think, vests in the complainant all rights of the partnership relating to the property in question.

There is no pretence in the case that there are any creditors of the partnership in this State, the fact being, that there are substantially no outstanding debts against the firm. The complainant's standing in this court is therefore unimpeachable. *Bidlack* v. *Mason, 11 C. E. Gr. 230;  Hurd* v. *Elizabeth, 12 Vr. 1.*

The jurisdiction of a court of equity to set aside a sale of personal property on the ground of fraud, or other basis of equitable jurisdiction, is well established, and rests on the same grounds as that over conveyances of real estate. *Smith* v. *Wood, 15 Stew. Eq. 563;  S. C. on appeal, 17 Stew. Eq. 603.* The jurisdiction is concurrent with that of courts of law. And suits by creditors

to set aside mortgages and sales of personal property are of frequent occurrence in this court. It is true the rule, as usually expressed, applies to sales and conveyances in fraud of creditors, and it was contended on the argument that it goes no farther, and does not include partners, and that this is, in effect, a suit by one partner for his own benefit and not for that of creditors, and that the complainant's true and only remedy is either to seize the timber in controversy or bring trover or replevin for it.

But it seems to me that this view is too narrow, even if we read the rule as applying only to creditors. Each partner is, of necessity, before the accounts are finally settled between them, a creditor of, and a debtor to, the firm.

He is a creditor for whatever he has advanced to it as capital or otherwise, and he is directly interested in all its assets precisely as outside creditors are. Courts of equity have frequently interfered in cases like the present. *Sloan* v. *Moore, 37 Pa. St. 217; Kerr Fraud 332, and notes;* and every consideration in favor of exercising jurisdiction on behalf of creditors applies in favor of one partner against the fraudulent acts of his copartner. The remedy in equity is much the more effective, convenient and complete in such cases. For instance, the complainant, as here, may be an officer of the court, and may find it very inconvenient, if not impossible, to give security in replevin. The claimant of the property, as here, may be a non-resident, and so not subject to process from a court of law. He may be insolvent. The complainant may not have such complete knowledge of all the facts as to enable him with safety to take decisive action in a court of law. A court of equity may give relief on terms, according as the facts may develop themselves at the trial, where such facts would defeat an action at law. In the case in hand, the court may, in the end, hold the sale herein attacked to be a mortgage, and give the complainant the right to redeem.

In many cases, the remedy at law may prove to be incomplete and inadequate, and particularly as between partners, of whose disputes this court necessarily takes cognizance.

But, independent of these various considerations, I can, after full consideration, see no difference in principle, so far as equity

jurisdiction is concerned, between a suit to set aside a convey-ance of realty and one to set aside a transfer of personalty, and know of no reason why a court of equity should not entertain the one as readily as the other. It is true that it may be more important to the complainant to have the decree of this court in cases of real estate than in that of personalty, since he thereby annuls the adverse record title, which would remain as a cloud upon his title, notwithstanding the judgment in ejectment in his favor established it. But the jurisdiction of the court over such cases does not depend upon such additional or incidental remedy, but upon the fraud in the conveyance; and fraud practiced in a transfer of chattels is quite as potent a ground of equity juris-diction as if it had been practiced to procure a conveyance of land.

Much discussion was had as to the competency of the rebut-ting affidavits served by the complainant in reply to those on the part of the defendants. The defendants' counsel contended that the use of such affidavits was forbidden by the one hundred and twenty-first Rule. Complainant, on the other hand, relied upon the one hundred and twenty-third Rule, which provides for rebutting affidavits in reply to new matter set up in the answer on a motion to dissolve an injunction.

I do not think that, strictly speaking, either of these rules applies to the circumstances of the present case. An interim restraining order having been granted upon the filing of the bill, the present motion is in the nature of a motion on the part of the defendants to dissolve an injunction, and of a motion on the part of the complainant that a receiver be appointed. Rules 121 and 123, by their terms, apply only to injunctions. Further-more, I do not understand that those rules are to be applied, in all instances, with inflexible strictness. My understanding of the proper practice, in a case like this, derived from an examination of the reported decisions, is, that if a defendant, on either a motion to dissolve an injunction, or in resisting a motion for a receiver, relies upon new matter in support of the one motion or in opposition to the other, the complainant may have the privilege of putting in affidavits in reply to such new matter,

and that those affidavits need not, in the absence of a special order, be taken on notice. The strict rule always has been, and still is, that the defendant cannot set up new matter in his answer or affidavits, and rely upon it on a motion to dissolve. But that rule is seldom strictly enforced, the desire of the court being to avoid, as far as possible, making a decision upon a part only of the facts; and hence it is a common practice to allow the defendant to rely on new matter. But such practice would lead to injustice, unless the complainant be permitted in turn to reply to such new matter. *Johnston* v. *Corey, 10 C. E. Gr. 311, 315.*

In considering the affidavits, including defendants' surrebutting batch, I shall confine myself, as far as practicable, strictly within this rule.

The facts of the case, as I glean them from the pleadings in the Philadelphia suit, the pleadings in this suit, and the very numerous and conflicting affidavits, are as follows: The partnership was formed, as alleged, in 1885, and was successfully carried on for a period of three years, considerable profits having arisen from its transactions. The accounts were kept by Allen; the books and papers were in his possession, and the moneys received were deposited to his individual account. In the course of their business it was customary for the firm to purchase rafts of round and squared lumber which had been floated down the Delaware river from its sources in the State of New York, and on the 22d of February, 1888, they had on hand a large amount of such lumber, mainly situate in their log-pen in the river at Cooper's Point, near Camden. This lumber had been bought in the regular course of business for use in their business and not for sale. They also had between $25,000 and $30,000 (Eyre's affidavit shows, by a schedule, $28,771.85) due them for work which had been done and coming due on contracts which they had taken and which were then incomplete. They owed outside parties between $20,000 and $25,000 (Eyre's affidavit shows, by a schedule, $21,394.85). Their assets were considerably more than enough to pay their outside indebtedness. It is claimed by the defendant Allen, that he personally advanced at about that time large

sums to the partnership, making him, as against his copartner, Eyre, largely a creditor of the firm, but he does not dispute the accuracy of Eyre's statement of assets and liabilities. On the 22d of February, 1888, they had a dispute, which Eyre claims ended in an agreement to dissolve, but which Allen claims did not have that result, but that Eyre, without any complete agreement for dissolution, absented himself from the business and took no further part in it, leaving him (Allen) to close it up. Shortly afterward Eyre notified the defendant Wheeler of the dissolution. Some time during the first half of the month of March, 1888, Allen made a lump sale of all the lumber then owned by the firm, including the raft at Bordentown, to the defendant Wheeler, who was and had been for many years a dealer in that sort of lumber in the State of New York, being a producer and seller of it at wholesale in the Philadelphia market. The price was $6,780, and, according to Allen's affidavit, it was paid for by two notes which Wheeler held of the firm of J. P. Eyre & Co., amounting in the aggregate to the sum of $918.45, one of which notes did not mature until the month of April, 1888, and by the sum of $530 in cash received by Allen for one raft of the lumber sold out by Eyre to one Rotan for $530, and by three notes of Wheeler, one of $1,500 at two months, one of $1,600 at three months, and one of $2,231.55 at four months. No change was made in the location of the lumber. It remained precisely where it was, in the yard of J. P. Eyre & Co. No inventory or detailed estimate of its value was made. Eyre was not consulted about the sale, and did not know of it until afterward. He had sold the one raft out of it to Rotan and took $50 of the purchase-money as an earnest, with the understanding that Rotan should hold the balance of the purchase-money until it should be determined who was authorized to receive it. This sale was made on the 15th of March, and must have taken place *after* the sale by Allen to Wheeler, since Allen, in his affidavit, shows that in settling with Wheeler he gave him credit for the value of this raft sold to Rotan, the price of which he collected from Rotan. It must, therefore, have been in the pen at the time of the sale to Wheeler and been included in the sale.

At the time or after the bill was filed in the Philadelphia court, creditors began to press, and in order to satisfy one creditor, a bank, who had obtained judgment, Eyre made a deed of the only piece of real property he owned and raised sixteen hundred and odd dollars to pay the bank, and then, or sooner, requested Allen to join him in drawing orders on the debtors of the firm, to pay the creditors, who refused to pay to either partner singly or to honor drafts not signed by both. This obviously fair and proper mode of liquidating the indebtedness of the firm Allen at first refused to join in. Whereupon some creditors went into New Jersey and issued an attachment against the firm, by virtue of which the sheriff of Camden county levied on this very lumber, several months after the alleged sale to Wheeler. Other creditors came in under that attachment, an auditor was appointed, and motion was made to sell the lumber as perishable, and under the pressure of those proceedings, in which Wheeler seemed to take no interest, Allen finally consented to unite with Eyre in signing the necessary papers in order to appropriate the bills receivable and accounts payable to the firm towards the payment of their debts, the result of which was that all the debts were paid with a small exception, and the receiver has in his hands about $5,000 surplus. Allen's brother-in-law and employe, one Hungerford, was all the time in charge of the log-pen at Camden, as he had been before the dissolution, acting, as he says, under Wheeler's employment, and sales were from time to time made out of it in a retail way to various customers, and some of it was taken by Allen, but beyond that the defendant Wheeler exercised no acts of apparent ownership or other dominion over the property. And although there was some evidence that Eyre heard of the alleged sale shortly after it took place, which he substantially denies, it does not appear that he heard of the price at which it was alleged to have been sold, and, from all the circumstances—the fact that the logs remained in their original position, that no one appeared to claim them when the attachments were issued and levies made under them—I think he was justified in supposing that Mr. Wheeler made no serious claim to their ownership.

In March, 1889, or thereabouts, Eyre saw an account of Allen's, in which he charged himself with the purchase-price of these logs at the sum before mentioned, $6,780, and it was that item of his account which, apparently, first led Eyre to suppose that a serious contention would be made that the sale was a valid one. Motion was then made in the Philadelphia court, affidavits were presented on each side and the receiver was appointed.

Complainant, at the hearing, rested his right to a receiver upon the ground that the sale was made by one partner without the knowledge or consent of the other, after an actual dissolution, or what amounted to a dissolution, of the partnership, of the whole stock of lumber in a mass, not in the usual course of trade, without authority of the other partner, without advertisement, without inventory and appraisement, for a grossly inadequate price, to a person who was a producer and seller in that market and not a buyer or consumer, and without even reserving such of it as was needed to complete the unfinished contracts of the firm, and that the buyer had notice of the title of the firm and of its dissolution, and such notice of the impropriety of such a sale and of the want of power of a single partner to make it, as at least to put him on inquiry as to the rights and consent of the other partner; and the complainant alleges that the lumber should have been sold, in lots to suit purchasers, to consumers or persons who were making use of such lumber in Philadelphia and its neighborhood, and that, in that way, a fair and adequate price could have been obtained for it, and that the other partner should have been consulted about it and asked to aid in making the sales; and complainant asserts that, if such a course had been pursued, a much larger price could have been obtained for the lumber. In this last contention I think complainant is decidedly in the right, and, while I am not convinced that any such sum could have been obtained for it as complainant asserts it was worth, namely, $25,000, still I think that it is very plain, from the affidavits on this point, which are numerous and contradictory, that a much larger sum could have been obtained than that alleged to have been paid by the defendant Wheeler.

The defendants felt the force of complainant's position and attempted to meet it in various ways. They deny the inadequacy of the price, and say that it was the best that could be got for the property *when sold in that way, in a lump*, and produce the affidavits of several experts who support that view and say that a sale of a large lot of miscellaneous lumber in a lump, as that was sold, *must necessarily be made at a considerable sacrifice.*

It is to be here observed that this is precisely what the complainant complains of, and was indeed strange evidence to be produced by the defendants.

The defendant Wheeler, in his affidavit (not in his answer), gives, as a reason for his purchase, which he admits was made from Joseph P. Eyre & Co., and without denying notice of the dissolution,

" That said timber was in great part old and water-logged, and the remnants of rafts from which the best logs had been selected; that said *Allen wanted to sell it as a whole lot*, and this deponent was obliged to buy all of it if he bought any.

" That not half of it was available as good wharf-timber, and the whole quantity was between three and four hundred thousand feet of all kinds, good and bad. This deponent was interested in the rafting business, and desirous that *this inferior timber should not be thrown on the market and be sold at a low price, and thus break the prices for the deponent's rafts about to come down the river.*

" That this deponent, after some dickering, finally bought the rafts and loose logs in the said pen and another sunken raft at Bordentown, of little value, for the sum of six thousand seven hundred and eighty dollars.

" That this deponent thought then, and believes now, that the said price was as much as the timber was worth, *taken as a whole lot;* that said Allen declared that he should sell said timber to get a sale that Spring, and this deponent's new timber would have to find such market as would be left."

This statement, even if taken as credible and true, seems to me rather to support than confute complainant's contention, that the sale must have been made at a sacrifice, and that the only proper mode of disposing of it was to offer it to purchasers who were consumers of lumber in the Philadelphia market in lots to suit them.

Wheeler further states, in his sworn answer, and also in his affidavit, that the purchase was made in entire good faith, with-

out any agreement or understanding that Allen should have or receive any benefit or advantage from it; that he has paid the notes which he gave for the timber, and that he has had the control and possession of it ever since the sale, except portions which he has sold ; that Allen has sold, at his request, a portion of it, and that he (Wheeler) has sold other portions, and that Allen has no interest in the sales, or right or property in the timber or in the proceeds of the sale of it.

The defendant Allen justifies his conduct upon two grounds mainly : First, and in his answer, he says that the said firm was insolvent (his own affidavit shows that it was not insolvent, unless his own advances were counted as debts); that its assets were wholly insufficient to pay its debts; that suits were pending against it for undisputed debts, and that, for the purpose of meeting those debts, said sale was made of said timber, as a whole, for the best price that could then be obtained for such a lot, and that he needed and used the proceeds for paying the pressing debts of the firm, and that he was compelled to sell it in one lot, and—

"That the price obtained by this defendant was, at the time and under the circumstances which *compelled said sale as a whole lot as aforesaid,* and considering the condition of the said timber, a full and fair price for the same."

The above is the ground taken in the answer itself. In his affidavit annexed to his answer he states, as the reason why he sold the timber to Wheeler, that, in the month of March, 1888, he learned that one Rotan had removed one raft of lumber from the log-pen at Camden, and, upon inquiry, found that he did it by virtue of a purchase which he alleged that he had made from Eyre, and showed Eyre's receipt for $50 on account of it; that, on discovering that Eyre was disposing of the property of the firm, he asked the advice of his counsel, and was by him advised that Eyre might dispose of all the assets of the firm, and that, knowing Eyre was irresponsible, and that the assets were wholly insufficient to pay the debts and obligations of the firm, and, acting under the advice of his counsel, he began also to dispose of the property of the firm, and to apply the proceeds to the pay-

40

ment of the debts and obligations of the firm ; and that, in pursuance of that policy, and in view of debts of the firm coming due and suits brought against the firm, and he (Allen) feeling under obligations to take his private moneys to pay the debts, he opened negotiations with and made a sale of the whole of the timber to Wheeler for $6,780. The additional matter in excuse for the sale contained in the affidavit, over and above that contained in the answer, is the fact that *he learned that Eyre had sold one raft to Rotan,* and the date of that sale is fixed by the receipt as of the 15th of March, 1888, and the raft was removed presumably somewhat later than that. *The effect of the affidavit is to state that the sale was made to Wheeler after the raft sold to Rotan had been removed.* In that connection, Allen makes a statement of how Wheeler paid the $6,780, and among the items going to make up that sum, as paid by Wheeler to him, is the following : " Cash, for raft sold by Eyre to Rotan, $530."

Now that proves, as complainant contends, and as I think, most conclusively, that when this sale, or pretended sale, was made to Wheeler, the Rotan raft was still in the yard in the log-pen and was counted in as a part of the lumber so sold. Else why give credit to Wheeler for the amount received from Rotan for the raft ? It is impossible to account for that credit being given to Wheeler, except upon the basis of the raft being included in the sale to him ; and if included in the sale to him, then the sale must have taken place before the removal of the raft by Rotan, and it must have taken place before Allen heard of the sale to Rotan, for he distinctly swears that he first heard of it after the raft had been removed. I think, then, that in this part of his affidavit, Allen contradicts himself, and shows that the sale to Rotan by Eyre was not one of the causes which led him to make the sale to Wheeler.

In this connection it is worthy of remark that, although the defendants had the means of fixing and stating the date of the alleged sale to Wheeler with absolute accuracy, they fail so to do. The only data in connection with it is the credit to the firm in Allen's account for the proceeds of the sale, which is " March 19, cash."

Then, with regard to the debts of the concern pressing him and suits being brought, he fails, in the affidavit annexed to his answer, to name a single suit that had been brought, or a single bill that was overdue, prior to the sale to Wheeler, which must now be fixed as having taken place in the first half of the month of March, 1888.

Eyre, in his rebutting affidavit, states that there were no bills due or debts pressing at the date of the dissolution, nor until some period had elapsed, and he says that, before the maturity of the note held by the bank, which was afterwards put in suit, Allen had collected and had in his hands $3,000 from a debt due the firm, and which he had not appropriated to the payment of any indebtedness, and, instead of using it to pay the note in bank, he allowed that to go to protest, and induced the bank to sue the firm and obtain judgment with the design of having a levy made upon the firm's property and assets, and a judicial sale made and have the same bought in for his own use, and that, in order to prevent such result, Eyre raised the money by pledging his own property and paid the judgment.

In his surrebutting affidavit, Allen gives a list of pressing debts due by the firm in February and March, 1888, amounting to $1,600, and falling due between February 25th and March 15th, besides two judgments, the amounts and dates of which are not given, nor do I find in his account any credit for either of them having been paid; and he says there were other large amounts due on open accounts, and that Eyre's statement and list of bills due the firm, amounting to over $28,000, is incorrect in not stating that the greater part of them were not yet due. But, as before remarked, he does not dispute the accuracy of Eyre's statement and list of bills payable and receivable showing a balance in favor of the firm of some $7,000, not of course including lumber, materials and machinery.

He further shows that the bank judgment was founded on a note of Eyre endorsed by Allen, for the purpose apparently of showing Eyre's inaccuracy. But his own account shows that the proceeds of the note's discount went to the firm's credit, and

Sobernheimer *v.* Wheeler.

that the note was a firm debt, for he gives Eyre credit for having paid it.

Further, with regard to the debts, defendant Allen, in his answer and in his affidavits, shows that they have all been paid, with the exception of one for $500, and that a surplus of about $5,000 remains in the hands of the receiver; and the rebutting affidavit of Eyre shows that those debts were mostly paid by drafts drawn upon the debtors of the firm in favor of the creditors under the circumstances hereinbefore stated.

Upon the whole case, as it now appears by the affidavits, it seems to me that a very moderate amount of good business management ought to have liquidated the firm's indebtedness without any serious sacrifice, and without resorting to a sale of the lumber in question in the manner it was done.

Without going further into details on this point, a great amount of which is found in the various affidavits on both sides, I am satisfied that there were no such reasons or occasion for the sale of the lumber at the time and in the manner that it was sold, as Allen sets up in his answer and affidavits, and that, in that respect, the defendants not only fail, but fail in such a manner as to cast suspicion upon the whole transaction.

Bearing on the *bona fides* of the sale in question, is a rather remarkable clause in the affidavit of Joseph H. Watkins, produced and read by the defendants, who swears that he was employed by Eyre & Co., and after the dissolution, by the defendant Allen, and that he was in his employ at the time of the making of the affidavit. In it he says:

"Deponent further says, that immediately after the disappearance of J. P. Eyre from the firm of J. P. Eyre & Co., Jos. S. Allen, the remaining partner of said firm, endeavored to get work in the firm name, and on several occasions the said Allen bid for the said work in the firm name and was the lowest bidder; deponent knows that through the action of said J. P. Eyre [sending threatening, libelous letters to parties having control of said work], Mr. Allen was prevented from obtaining such contracts. Deponent further says, that he was with Mr. Allen after J. P. Eyre left on February 22d, 1888, and knows that the *said Allen made every endeavor, up to July, 1888,* to get work in the firm name, in order *that the timber in question* might be used in said work, and the business of the firm of J. P. Eyre & Co. settled."

The bearing of this affidavit is obvious.

Why should Allen endeavor to obtain contracts to work up lumber which he had previously sold out and out, and had no further interest in?

The defendants' counsel relied upon the very full and explicit denial, by both defendants, of any fraud or collusion between them, or of any purpose on the part of Allen of cheating Eyre, and on the positive allegation of both that there was no agreement, express or implied, that Allen should derive any benefit, directly or indirectly, from the sale. But the denial does not reach or account for the undisputed facts in the case which have been heretofore stated, but goes only to the inference to be drawn from them, and is pervaded by the inherent weakness of such denials. Besides, they do not go to the whole of the complainant's case, for, if it be admitted that there was no secret trust in favor of Allen, nor any understanding, express or implied, that he was to receive any benefit, directly or indirectly, from the sale, and if it were made in good faith and the consideration paid, still, if it were made without proper authority on the part of Allen and for an inadequate price, this court might, and, I think, ought to, declare it to be a mere mortgage, and give the complainant a right to redeem upon proper terms.

It was argued, on the part of defendants, that the mere inadequacy of price in the sale of the lumber gives complainant no standing in this court, since, so it is contended, if Allen unlawfully or negligently sold partnership assets at a sacrifice, he is chargeable, in settling his partnership account, with the amount lost to the firm by such misconduct, and that he is abundantly responsible, pecuniarily, for any decree that may be made against him, and hence complainant has a complete remedy in that respect in the Philadelphia suit. Affidavits in support of Allen's pecuniary responsibility were read by the defendants, and against it by complainant in rebuttal. I have not thought it worth while to pay any attention to this part of the proofs, for the reason that I think defendants' position on this point untenable. Possibly it might be a ground for applying to the Philadelphia court to interpose and direct its officer to stop this suit, but here

Sobernheimer *v.* Wheeler.

it can have no weight. The question is, not whether the complainant may not have a cause of action against Allen, but whether he had any title, legal or equitable, to the lumber in question. If he has any such title this court will, under proper circumstances, aid him in enforcing it, without regard to his other remedies.

The argument of defendants' counsel on this point, carried to its logical results, would deny relief by foreclosure to a mortgagee if he happened to hold the bond of a responsible party for the debt secured by the mortgage.

Much discussion was had before me as to the power of one partner over the partnership assets, both before and after dissolution. The complainant contended that, independent of any fraudulent collusion, there was a want of authority on Allen's part to make the sale. The transaction in question took place in Pennsylvania, where the partnership was domiciled, and the law of that State, as I now think, governs; and, as showing what the rule in that State is, *Sloan* v. *Moore, 37 Pa. St. 217*, and *McNair* v. *Wilcox, 46 Leg. Int. 17, 121 Pa. St. 437*, were cited, and in this State, *Ruckman* v. *Decker, 8 C. E. Gr. 283*.

The Pennsylvania cases do certainly go a long way in support of complainant's contention, and I think they are fully in accord with, and apt illustrations of, the general rule of law on this subject. I do not deem it necessary to state them at length. The authority of one partner to bind the firm is wholly and solely that of an agent to bind his principal, and is always, in the absence of express authority, limited by the scope of the partnership business, and what is necessary to carry it on.

*Lind. Part. 124–126.* Says the very learned author (*p. 126*):

"It will be observed that what is *necessary* to carry on the partnership business in the *ordinary* way is made the test of authority where no actual authority or ratification can be proved. This is conformable to the most recent and carefully considered decisions; but by adopting it the liability of a firm for the acts of its copartners is not so extensive as non-lawyers sometimes imagine. The act of one partner to bind the firm must be *necessary* for the carrying on of its business; if all that can be said of it was that it was *convenient*, or that it *facilitated* the transaction of the business of the firm, that is not sufficient in the absence of evidence of sanction by the other partners.

Sobernheimer *v.* Wheeler.

"Nor, it seems, will *necessity* itself be sufficient, if it be an *extraordinary* necessity. What is *necessary* for carrying on the business of the firm, under *ordinary* circumstances and in the *usual* way, is the test; and, therefore, in a case where the nature of the business was one in which there was *no* necessity to borrow money to carry on the business under *ordinary* circumstances and in the *ordinary* manner, the court held the firm not liable for money borrowed by its agent under extraordinary circumstances, although money was absolutely requisite to save the property of the firm from ruin. This case is an authority for saying that a power to do what is usual does not include a power to do what is unusual, however urgent; and although, in the case referred to, the money was not borrowed by a partner, but by a person who was only an agent of the firm, the decision would, it is apprehended, have been the same, if he had been a partner.

"For, notwithstanding the fact that every partner is to a certain extent a principal as well as an agent, the liability of his copartners for his acts can only be established on the ground of agency. As their agent he has no discretion whatever within the limits set by them to his authority, and the fact that he is himself, as one of the firm, a principal, does not warrant him in extending these limits, save on his own responsibility."

The learned author cites abundant authority in support of this luminous text, and it was cited with approval and applied in the very recent case of *In re Cunningham & Co. Limited, Simpson's Claim, L. R. (36 Ch. Div.) 532,* and see Doctor Ewell's notes to *Lind. Part. 127.*

The business of this partnership was not that of selling lumber, but of buying and using it. The sale in question was not in the ordinary course of its business, and was not, so far as the facts now appear, justified by any extraordinary circumstances; and, even if it were, it seems to have been unauthorized by the other partner.

But I do not deem it necessary, under the circumstances of this case, to settle definitely at this time the law of it in complainant's favor. It is enough, as I think, for present purposes, if I am satisfied that there is a high degree of probability that he will finally succeed.

In determining the question whether or not a receiver shall be appointed, the court considers the effect and consequences, in the particular case, both of the proposed action and of non-action. Here the property to be taken into the custody of the court is held for the purpose of sale, and for that only. Its seizure will

not break up or interfere with any particular business undertaking, nor will it in the least interfere with its sale. There is no need of its being removed from its present location, and a purchaser or purchasers for it can be found, and a sale or sales carried through by the person claiming to be the owner as well while in the custody of this court as otherwise. The receiver can be directed to carry out any eligible sale or sales made by the defendant Wheeler. The cost of its care and keeping will not be increased. The only increase of expense will be the receiver's commissions, and the only effect of the receivership will be the impounding of the proceeds of the sale in this court to await the event of the suit. On the other hand, unless the property is so taken possession of by the court, the action, however meritorious it may prove to be, will be futile and barren of results. The complainant has made out a strong *prima facie* case. Under such circumstances, it seems to me, the duty of the court is, plainly, to retain this property, or its proceeds, within its jurisdiction to await the result of the action.

I will advise an order for an injunction and appointing a receiver. The latest estimate put upon the value of the property remaining at this time is $10,000 to $12,000. The receiver should give bond in the sum of $15,000. I name that sum because I judge it not probable that a sale of the lumber will be effected in a lump, or at any one time, and if sold in parcels and at different times the money can, if necessary, be paid into court by the receiver.